534 So.2d 1340 (1988)
Stephen N. GREGOR, Jr.
v.
CONSTITUTION STATE INSURANCE COMPANY, et al.
No. CA 8080.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1988.
Writ Denied January 20, 1989.
Jeffrey C. Collins, New Orleans, for plaintiff-appellant.
Ronald K. Gurley, New Orleans, for defendants-appellees.
Before BARRY, ARMSTRONG and PLOTKIN, JJ.
ARMSTRONG, Judge.
Plaintiff, Stephen N. Gregor, Jr., instituted this action for damages incurred as a *1341 result of injuries sustained in a fall from an eight-foot high roof. Named as defendants were Constitution State Insurance Company, John F. Robbert, and Davey Jones' Locker, Inc. A third-party demand was filed by defendants against Jerome Slade. It was stipulated by the parties that the issue of liability would be tried first. After due proceedings judgment was rendered in favor of defendants, dismissing plaintiff's suit. The third-party demand fell with the original demand. Plaintiff now appeals.
On October 16, 1985 plaintiff fell off of the roof of a utility shed which was located at the rear of a bar called Davey Jones' Locker. Davey Jones' Locker is located on the ground floor of a two-story building facing Magazine Street. The lot extends through to Camp Street. An alleyway along the right side of the bar leads to the rear of the establishment where three structures are located. To the right was a one-story wood-frame "utility shed." On the opposite side of the lot, across a walkway, was a cinderblock "recreation room." Backing up to Camp Street was a cinderblock building referred to as the "bunkhouse." The recreation room structure runs from the rear of the barroom to the bunkhouse.
The bunkhouse, a sort of dormitory, contains approximately sixteen beds on the ground floor and in a loft area. Traditionally, non-union seamen have rented these beds by the day or week, while awaiting their next job. For many years Davey Jones' Locker served as a hiring hall for non-union seamen. A foreign vessel in need of a seaman would contact someone at Davey Jones' Locker and one of the denizens of the facility would be recruited. In recent years the bar has also rented beds to non-seamen. A typical resident of the bunkhouse drinks in the front barroom. Alcohol purchased elsewhere is not allowed in the bunkhouse area.
The recreation room contains a television and a dining area. The roof of this structure is flat and was accessible via an aluminum extension ladder leaning against it. The ladder was chained and padlocked to a pipe which ran along the rear of the barroom. Residents used the roof of the recreation room to sunbathe and dry their clothes. The utility shed contained a washing machine and five or six clotheslines ran from the eaves of the bunkhouse, which appeared to be four or five feet higher than the roof of the recreation room, to the pipe attached to the two-story barroom building. Extending out from the side of the recreation room roof, and attached to the rear of the barroom, was a connecting roof or awning, as described by the plaintiff. This awning appeared to be a piece of tarpapered plywood, slanted down to a point one and a half to two feet higher than the utility shed roof. The corner of the awning and the utility shed roof were in close proximity.
Some junk was stored on the roof of the utility room. Photographs taken after the accident show two wooden doors, an old metal water fountain, an old wooden ladder, a drainpipe and length of gutter, an automobile bumper and several long thin pieces of wood moulding. At least some of this junk was on the roof the day of plaintiff's accident.
From 1965 through 1986 plaintiff, a seaman and offshore oil worker, lived in the bunkhouse. He had been washing his clothes and climbing up on to the recreation room roof to dry them for some twenty years before the day of his accident. He testified that he had been on the utility shed roof before and had seen residents playing cards up there. The evidence showed that in addition to the junk stored there, plastic garbage bags containing discarded aluminum cans from the bar were stored on the utility shed roof for up to several days.
The residents kept their living area clean. This appears to have included the bunkhouse, recreation room, utility shed, and the walkway area. Plaintiff claimed that on Thursday evening, two days before the Saturday accident, Jerry Slade, who managed the bar and bunkhouse operation, *1342 informed him that "this place looked dirty and that it was up to us [the residents] to keep it clean." Slade allegedly told plaintiff that if they couldn't keep it clean "he would get somebody else who could keep it clean," and raise their rent to cover the cost. Plaintiff did not testify that Slade specifically mentioned the junk stored on the utility shed roof. However, Slade testified that city inspectors had complained to him about the junk on the roof.
At the time of the accident plaintiff was performing day labor. Plaintiff testified that the next morning, Friday, before he went to work, he heard a rat scurry across the utility shed roof. He cited this as one reason why he eventually decided to clean off the roof. After work Friday evening plaintiff consumed two beers and returned to Davey Jones' Locker where he began drinking heavily. Between 5:00 p.m. Friday and 3:30 p.m. Saturday plaintiff estimated that he consumed "at least" twenty combination rum and cokes or rum and beers. This was apparently a continuous drinking binge and he didn't sleep that night. Plaintiff testified that by 3:30 p.m. Saturday he was extremely intoxicated. About that time, on his own, without any prompting, plaintiff climbed the ladder to the recreation room roof, stepped down onto the angled awning, and "jumped" down to the pitched roof of the utility shed. He tottered over to pick up a long narrow piece of wood moulding. He testified that he thought the moulding was nailed to or somehow attached to the roof, so he forcefully jerked it up. The piece of moulding, however, was simply lying on the roof. Consequently, when plaintiff jerked it up he lost his balance and toppled off the edge of the roof eight feet to the ground below, injuring his back.
Based upon this evidence the trial court found no liability on the part of the defendants (owner, lessee, insurer) under either theories of strict liability or negligence. On appeal plaintiff claims that the trial court erred in failing to apply the proper standard of care owed by (1) an innkeeper to his guests, and (2) a retailer of alcoholic beverages to an intoxicated customer. He also claims that the court erred (1) in failing to consider a municipal ordinance requiring railings on porches, and (2) by not recognizing that the lack of a railing rendered the roof defective. There were also some issues raised concerning the relationship between John Robbert, who purchased the property some months before the accident, and Slade, the manager of the facility at the time of the accident. Our disposition of the pivotal issues does not require that we address the relationship between these parties.
At the time of this accident and trial, La.R.S. 26:88(2) (now La.R.S. 26:90, subd. A(2)) made it a criminal offense for a bar to "sell or serve alcoholic beverages to any intoxicated person." In Thrasher v. Leggett, 373 So.2d 494 (La.1979), the Louisiana Supreme Court examined La.R.S. 26:88(2) and overruled its prior decision in Pence v. Ketchum, 326 So.2d 831 (La.1976) in which it had held that a violation of the statute followed by harm to the intoxicated person gave rise to a cause of action against the vendor of the alcohol. In reaching its decision the Thrasher court noted that the cause more proximate to an injury to an inebriated patron which results from his intoxication is the consumption of the alcoholnot the sale. The court did recognize that La.C.C. art. 2315 imposed upon a bar owner a duty to avoid affirmative acts which increase the peril to an intoxicated patron. Referring to the facts of Pence, supra, the court noted that it would not be inappropriate to find that a proprietor who closes his establishment and puts an inebriated patron out on a busy highway breaches his duty not to increase his patron's peril. The affirmative act contemplated is one separate and apart from selling alcohol to an intoxicated person in violation of La.R.S. 26:88(2).
In the case at bar there was no affirmative act done by any one running the bar that increased the peril to the plaintiff. Plaintiff voluntarily left the bar in an inebriated *1343 condition and acted in an unreasonable manner. Plaintiff's assertion that serving alcohol to an intoxicated patron is an affirmative act as described by the Thrasher court is incorrect. Also, allowing loose doors, gutters, etc. to be stored on the roof of the utility shed was not an affirmative act. Nor was the alleged failure to have a railing on the roof an affirmative act.
Plaintiff premises his claim for recovery on theories of strict liability under La.C.C. arts. 660, 2322, 2695, and 2317. His position is grounded on the proposition that the condition of the pitched utility shed roof was defective because it did not have a railing to prevent such an accident as occurred here. We find no merit to plaintiff's argument. The roof of the utility shed was accessed by plaintiff climbing up the ladder to the roof of the recreation room, stepping onto the awning, and jumping down onto the utility shed roof. Although it was thereby possible to access the roof, it does not appear that residents were supposed to use it. The ladder was there to provide access to the flat, wide roof over the recreation room where residents could hang their clothes to dry, sunbathe, or lounge. Residents and/or the owners obviously stored trash on the utility shed roof and likely had to get onto the roof to haul at least some of the items up there. But it does not appear that the utility shed roof was ever intended to be used as a recreational area for residents. In fact, the photographs introduced in evidence show a cluttered, pitched roof with no room for lounging. This is in contrast to the clean, uncluttered, flat, wide roof of the recreation room. There was no need for a railing around the edge of the utility shed roof. Plaintiff cites a municipal ordinance which requires that porches to be equipped with railings. This was a roof, not a porch. The ordinance has no application to the facts of this case.
We find that the lack of a railing on the roof did not in any way render the "thing" defective. We also find that the trash itself did not render the thing defective or create an unreasonable risk of harm such as would support a finding that the defendants were strictly liable.
Examining the issue of negligence under La.C.C. arts. 2315 and/or 2316 we again note that there was no duty to install a railing on the utility shed roof. We have also previously addressed the issue of negligence regarding the actions of the bar in serving alcohol to the already intoxicated plaintiff. Plaintiff claims that the special standard of care owed by an innkeeper to his guests should apply in this case. The bunks in the rear were rented by the day or week. Plaintiff paid $25.00 per week. A city inspector had recently informed John Robbert that he would need to obtain a rooming house permit to continue renting beds in the rear. Although there may be some question whether this was a true innkeeper-guest relationship rather than a landlord-tenant one, we will assume for the sake of argument it was either the former or a hybrid relationship.
An innkeeper owes his guest a high degree of care and protection. Kraaz v. La Quinta Motor Inns, Inc., 410 So.2d 1048 (La.1982); Brown v. Harlan, 468 So. 2d 723 (La.App. 5th Cir.1985). A basic element of this duty is to maintain the premises in a reasonably safe condition. Lorio v. San Antonio Inn, 454 So.2d 864 (La.App. 5th Cir.1984). Even considering this greater than ordinary standard of care, we are unable to find any fault on the part of the defendants.
If the defendants owed a duty to its residents not to store junk on the utility shed roof, that duty would not have extended to cover the risk that an inebriated resident, on his own initiative, would climb onto the pitched roof and recklessly jerk up a loose lightweight piece of wood and fall off the roof. The risk posed by such conduct would appear to be that an object might slide off of the roof and injure someone below. Also, any causal relationship *1344 between the breach of such a duty and the plaintiff's injury is too attenuated. Plaintiff, it seems, would like the court to recognize a general duty owed by the defendants to have made the premises "inebriate proof." But, however distasteful we find this business operation, we are unable to recognize such a duty. In Thrasher v. Leggett, supra, the Louisiana Supreme Court relied heavily on the idea that man has a free will and is responsible for harm to himself as a result of voluntary intoxication. In the case at bar, as in Thrasher, the cause more proximate to plaintiff's injuries was his voluntary intoxication, not the conduct of any of the defendants.
Applying the standard of appellate review enunciated by the Louisiana Supreme Court in Canter v. Koehring, 283 So.2d 716 (La. 1973), and explained in Arceneaux v. Dominque, 365 So.2d 1330 (La.1978), we find that the record evidence furnished a sufficient basis for a finding by the trial court that the defendants were not negligent or strictly liable for plaintiff's injuries. We are unable to say that such a finding was clearly wrong.
For the reasons assigned we affirm the judgment of the trial court.
AFFIRMED.
BARRY, J., concurs.